

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00226-CR
No. 02-23-00227-CR

_____

JAMES PIERSON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court Nos. F21-1760-462, F21-1761-462

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

In this appeal from convictions for multiple child-sex offenses, James Pierson challenges the evidence's sufficiency to prove the five counts on which he was convicted—one count of continuous sexual abuse and four counts of indecency with a child. *See* Tex. Penal Code Ann. §§ 21.02, 21.11. He also raises a partially unpreserved evidentiary complaint. We affirm.

## Background[1]

In May 2021—during a conversation about the complainant's sexually charged emails with a boy, for which she had been "pulled . . . out of school"—the then-thirteen-year-old complainant made an outcry to her mother, her father,[2] and her mother's best friend. According to Mother, after she and Father had "plead[ed] with [the complainant] to tell [them] what had been going on . . . with her so [that they] could help her," the complainant "burst out in tears . . . and just yelled [that Pierson] had been touching her."[3] The complainant then began screaming and crying. In her

---

[1]We will provide a more detailed factual summary in our discussion of the evidence's sufficiency to support Pierson's five convictions.

[2]To protect the complainant's identity, we do not refer to family members and witnesses by their given names. *See* Tex. Const. art. I, § 30(a)(1); Tex. R. App. P. 9.10(a)(3). And although Pierson was married when the abuse occurred, he was divorced by the time of trial; for ease of reference, we refer to his former spouse as his ex-wife, regardless of their marital status at the relevant time.

[3]Father generally confirmed this testimony as well as Mother's testimony about the content of the outcry.

2

outcry, the complainant described Pierson's actions: he had her "kiss" his penis; he "forcefully touched her" while she was taking a shower; he tried to grope her in bed;[4] he stuck his fingers in her vagina; he slapped her bottom; and he grabbed her breasts. According to the complainant, Pierson also showed her pornography and spoke to her about "adult topics" when she was alone with him. After the complainant's outcry, Father called Pierson, who "danced around the question" but eventually admitted that he had exposed his penis to the complainant because "she was curious about how a penis looked . . . going pee."

After the outcry, the complainant, Mother, and Father went to the police department to make statements.[5] The complainant also had a forensic interview and SANE[6] exam, and a CPI[7] investigator interviewed the family.

---

[4]The complainant told Mother that Pierson's ex-wife was in the same bed when this happened; when the complainant resisted Pierson's touching her—and she pushed back against him—his ex-wife perceived the movement but thought the complainant was dreaming and told her to stop moving around so that she didn't wake up Pierson.

[5]Mother admitted that some of the details she testified to at trial were not included in her written statement.

[6]The acronym SANE refers to either a sexual-assault nurse examiner or sexual-assault nurse examination, depending on the context.

[7]CPI is an acronym for Child Protective Investigations, which is a division of the Texas Department of Family and Protective Services that investigates reports of child abuse or neglect. *In re C.W.*, No. 02-23-00414-CV, 2024 WL 637264, at *1 n.4 (Tex. App.—Fort Worth Feb. 15, 2024, pet. denied) (mem. op.).

3

After the police investigated the complainant's outcry allegations, a grand jury indicted Pierson for one count of continuous sexual abuse and four counts of indecency with a child. A jury convicted him of all five offenses and assessed his punishment at the maximum for each offense: (1) life without parole for the continuous sexual abuse, (2) twenty years' confinement for three of the indecency counts, and (3) ten years' confinement for the remaining indecency count. *See id.* §§ 12.32–.34, 21.02(h), 21.11(d); *see also* Tex. Gov't Code Ann. § 508.145(a)(2). The jury also assessed the maximum $10,000 fine for each conviction. The trial court sentenced him accordingly.

## SANE Report

Pierson complains in his first issue that the trial court erroneously (1) admitted the SANE's report, (2) allowed her to testify about its contents, and (3) permitted her testimony to go beyond the examination's medical-diagnosis purpose.

When the State proffered the report—which the SANE had testified she made "[f]or a nursing diagnosis"—Pierson's counsel objected generally "to hearsay." The trial court overruled the objection. Pierson did not ask for or obtain a running objection, nor did he object to any of the SANE's subsequent testimony, including what the complainant had told the SANE about the offenses and what the SANE had observed about the complainant's mental health. Thus, we conclude that Pierson failed to preserve his complaints about the SANE's testimony. *See* Tex. R. App. P. 33.1(a)(1); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (noting that

4

objections must be sufficiently specific); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003) (noting general rule that party must object each time evidence is offered). And because the SANE testified—without objection—to the report's contents, any error in admitting the report is not reversible. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.").[8]

We overrule Pierson's first issue.

## Sufficiency

Pierson argues in his second issue that the evidence is insufficient to support all five convictions because

> [t]he sole evidence in the case stems from the [complainant] and those who repeated what the [complainant] reported. Based upon the evidence of the [complainant's] lack of truthfulness and the delayed outcry, and the lack of reasonable and reliable portions of her allegations, the facts

---

[8]Pierson argues on appeal that the report could not have been made for medical-diagnosis purposes—the hearsay exception the State relied on at trial—because the exam was nonacute, that is, the SANE did not expect to find physical evidence because "a significant time had passed" since the sexual acts had occurred. We have already rejected Pierson's argument. *See Wells v. State*, 558 S.W.3d 661, 668 (Tex. App.—Fort Worth 2017, pet. ref'd) (collecting cases); *see also Crenshaw v. State*, No. 02-17-00200-CV, 2019 WL 761475, at *4 (Tex. App.—Fort Worth Feb. 21, 2019, pet. ref'd) (mem. op., not designated for publication). Here, before the trial court admitted the report, the SANE—who worked as a mental-health psychiatric nurse practitioner—testified that obtaining the patient's history and performing an external physical examination can help her provide therapeutic care for the patient's emotional needs.

of this case do not support that a rational trier of fact could have found the allegations at issue to have been proven beyond a reasonable doubt.

Pierson urges that the jury could not have rationally believed the complainant's version of events because the evidence shows that she was an untruthful person and that her "overwhelming behavioral issues . . . stemmed from inappropriate sexual behavior with boys." Pierson also argues that the jury should have believed his ex-wife's testimony that he "had not been able to physically achieve an erection for over ten years" instead of the complainant's testimony that he had an erection during several of the incidents that she recounted.

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). To explain why this jury could have rationally believed that the complainant was telling the truth about the acts Pierson committed—both at trial and in her outcry—we summarize the evidence in the context of its presentation at trial.

**Mother**

Mother testified that as the complainant aged, she went from being a "happy-go-lucky" kid to engaging in age-inappropriate behavior with boys, having inappropriate conversations with friends, and struggling with grades and depression;

6

eventually, the complainant had thoughts of self-harm and suicidal ideations.[9] Although when the complainant was younger she had wanted to spend too much time at Pierson's house, she later started to exhibit "extreme tension" around him and did not want to hug him. The complainant became angry.

After making the outcry and going through therapy, the complainant's behavior and mental health improved. Nevertheless, in the week before trial, she had trouble sleeping and eating, lost weight, and had thoughts of self-harm. Although she was scared about the trial, she still wanted to testify. On cross-examination, Mother admitted that the height of the complainant's mental-health problems coincided with the continuation of the COVID-19 pandemic, which was very stressful for the complainant and her family.

On both direct- and cross-examination, Mother testified that the complainant had trouble with telling the truth: "She always wanted to protect herself. She had a great trouble with just telling the truth for the most basic things. She would get caught in a lie that she was covering for herself, and she would -- even when faced with the truth, wouldn't acknowledge it until days after." Nevertheless, Mother did not think her daughter lied to her in the outcry because of "[t]he history with" Pierson.[10] Also,

---

[9]Father confirmed this demeanor shift.

[10]Mother explained that during a conversation with the complainant about her behavior problems with boys, Mother had suggested that the complainant talk to Pierson. The complainant's "behavior and demeanor" pivoted and "turned to more anger." Mother also remembered that she had seen Pierson occasionally poke the

Mother could tell how immensely relieved the complainant appeared after the outcry. According to Mother, the complainant's emotion was believable—"When she's in self-preservation lying mode, she's not on the floor blubbering in a puddle. She's standing up and talking to us. And sometimes she'd get loud. She wanted to protect herself. This time -- this time she was like a little toddler on the ground that just needed comforting."

According to Mother, Pierson had taught the complainant how to lie for him, and the complainant's psychiatrist thought this coached lying was at the root of some of the complainant's behavioral problems.

Mother admitted that there was a time the complainant wanted to go to Pierson's home regularly, sometimes more than her parents wanted her to; this was around the time when the complainant said Pierson began abusing her.[11] But the complainant later began to resist being alone with Pierson and would want to be around him only when his ex-wife was present.

---

complainant "on the butt." The complainant had told Mother that it made her uncomfortable, and Mother told Pierson to stop, but he didn't. Finally, both Mother and Father testified that Pierson had asked to take the complainant on trips alone; Mother said that the complainant resisted being alone with Pierson. According to Mother, Pierson "was mean" to the complainant when she was younger, but then their relationship became closer as the complainant got older.

[11]The complainant and her family had lived with Pierson until the complainant was six years old.

**Father**

Father confirmed that the complainant had trouble with telling the truth when confronted with wrongdoing, such as "sneaking snacks during the night"; having a boyfriend; deleting emails; or misusing her school laptop. Father admitted that he and Mother were strict about boys and that the complainant must have known when she made the outcry that she could get in trouble for her sexual email conversation with a boy. But Father testified that the complainant's demeanor during the outcry was different from her demeanor when she had lied because she "never lied about getting someone else in trouble" and because he didn't think he'd ever seen her cry that hard before.

**The complainant's friends**

One of the complainant's friends testified that around the time of the outcry, she saw the complainant crying in school; when she asked the complainant what was wrong, the complainant told her about the abuse and identified a person she knew as the perpetrator. Another friend testified that she saw the complainant being rude to Pierson in a way that was out of character. When she asked the complainant why she acted that way, the complainant said that Pierson had sexually abused her. After that, the complainant's friend noticed that the complainant would get sad when she saw Pierson; she would not hug him or want to be near him.

**Pierson's ex-wife**

Pierson's ex-wife testified that when the complainant was around ten or eleven, she started to act as if she disliked Pierson. She no longer wanted to go places with him. Nevertheless, at times, Pierson's ex-wife would leave the complainant alone with him. The complainant used to sleep in the middle of the bed between Pierson and his ex-wife; although Pierson's ex-wife was a heavy sleeper, the complainant moved and kicked a lot. When the complainant was eleven, she asked to sleep on the edge of the bed so that the ex-wife would be in between the complainant and Pierson.

Pierson's ex-wife became worried about the complainant two years before the trial: "She was just not doing the things she should be doing. She was not hanging out with the right people. She was giving her mom and dad grief. She was just very, very unhappy." She exhibited animosity toward Father and lied to get out of trouble. But the complainant had improved "[i]mmensely" since the outcry.

Pierson's ex-wife testified that she had never seen him watch pornography during their marriage. She also confirmed that, beginning in his mid-60s when he started taking heart medication, he gradually lost the ability to achieve an erection. But when asked, "And that would only be something that you could testify experience-wise just with you . . . .?" she answered, "Correct."

**The SANE and CPI investigator**

The SANE testified that although the complainant was nervous about the exam, she tolerated it well and answered all the questions. Many of the details the

10

complainant told the SANE correspond to those that the complainant told Mother and Father. The SANE testified that, in her work, she had seen a correlation between sexual abuse and risky sexual and other behaviors—such as hypersexuality—and poor mental health, especially PTSD. The SANE saw trauma responses in the complainant consistent with PTSD—emotional outbursts, negative thoughts and moods, self-harm and suicidal ideations, anxiety, and depression.

When asked if difficulty telling the truth can be a trauma response, the SANE answered, "[T]hat could be the person's personality." She also testified that memories of details can become clearer as a person heals and processes. She further testified that telling a child to keep abuse secret can be grooming behavior that causes trauma.

The CPI investigator who watched the complainant's forensic interview testified that the complainant's statements were consistent with what she had told her parents and others. The complainant even asked to give an additional interview as she started to remember more details about the abuse. In the second interview, the complainant did not recant what she had said previously; she simply "share[d] some of the other incidents she remembered." The investigator determined that there was "reason to believe" the allegations against Pierson.

**The complainant**

The complainant testified that she was eight years old when Pierson first touched her. She was at Pierson's house with her parents, but she had accompanied him to the backyard shed to get a tool. He started rubbing between her legs and then

11

he rubbed her breasts and buttocks. Pierson also unzipped his pants, took out his penis, and had her touch it. He had an erection. She obeyed when Pierson told her to lick his penis. Pierson told her not to tell anyone, or he'd be sent to "the big house."[12] The complainant was confused by what happened.

The complainant also described another occurrence when she was ten: Pierson had taken off his pants to change them, but before he put on another pair, he started play-fighting with her; he took her pants off and then licked her "vagina." He fought back her attempts to resist him. Pierson then put his fingers in the complainant's vagina, causing her pain and bleeding. Pierson again told the complainant not to tell anyone or he'd be sent to the big house. The complainant testified that Pierson made her feel sad, so she didn't say anything about what happened.

After this incident, Pierson touched her every time she went over to visit[13]—in bed after his ex-wife had fallen asleep. Pierson touched her breasts, her buttocks, and her vagina, both under and over her clothes. He also touched her with his erect penis[14] and placed her hand on his penis. One time, Pierson showed her pornography on a phone. The abuse continued until she was almost twelve.

---

[12]Mother confirmed that Pierson used the term "big house" to refer to incarceration.

[13]Mother testified that the complainant visited Pierson and his ex-wife "fairly regularly" and sometimes multiple weekends per month.

[14]The complainant testified generally that "[w]hen the sexual encounters . . . occurred," Pierson had an erection.

Finally, when the complainant was twelve and Pierson tried to touch her breasts, she told him that if he didn't stop, she'd tell someone; he looked shocked and scared, but he stopped what he was doing.

The complainant admitted lying to her parents about "[b]ig things" and that Father sometimes intimidated her when questioning her about her bad behavior, prompting her to lie about it: "Because I didn't want to get in trouble. I was doing things I wasn't supposed to be doing. They wouldn't have approved of what I was doing." She admitted that she had rebelled against her parents' wishes.

The complainant confirmed the circumstances of the outcry, but she claimed that she had told her parents only that Pierson had touched her inappropriately; she denied telling them the details about which Mother had testified. According to the complainant, she first mentioned those details to the police over the phone, and even then, she did not describe all the specific events to which she testified at trial. When she talked to the police, she was screaming and crying: "It was probably the worst day of my life." The complainant explained that when she outcried, she was still in the midst of her trauma and that "it's very hard to remember all those details in a very traumatic moment." Therapy helped her remember the details of the abuse.

When asked to tell the jury why she told the truth when she did, the complainant said, "Because I was gonna kill myself. . . . If I hadn't told them then, I was going to kill myself." She rated her depression as 10 out of 10. Although it was hard for her to testify, she wanted to do so to get "justice for [her] family."

13

**Analysis**

The complainant's propensity for not telling the truth in particular situations was squarely before the jury, which was entitled to resolve any conflicts in the testimony. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018).[15] The jury could have concluded that even though the complainant often lied to get out of trouble, she had not lied when telling her parents, the police, and others about Pierson's sexual abuse. The complainant's version of events at trial was generally consistent with her outcry to her parents and her statements to friends, the SANE, and the forensic interviewer. The evidence showed that she had experienced mental-health trauma consistent with what sexual-abuse survivors experience. And other evidence showed that Pierson's relationship with the complainant was not appropriate—his touching her buttocks and refusing to stop even when confronted by Mother and his admitting to Father that he showed the complainant his penis because she was curious.

Importantly, the jury was able to observe both Pierson and the complainant testify. Pierson denied all the charged allegations.[16] In the context of all the evidence,

---

[15]For example, the jury was entitled to reasonably infer that although Pierson could not achieve an erection with his ex-wife, he was nevertheless able to do so in other situations. *See id.*

[16]Pierson did admit to some behavior, such as "poking [the complainant's] butt with a walking stick at soccer games or patting her on the butt as in [']good game.[']" But he claimed that he stopped doing that when Mother told him it made the complainant uncomfortable.

the jury was not required to disbelieve the complainant and believe Pierson. *See, e.g.,* *Mason v. State*, 687 S.W.3d 772, 780 (Tex. App.—Fort Worth 2024, pet. filed) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991), and noting that when witnesses' testimony is diametrically opposed, factfinder can choose to believe only one). Because the evidence described above was sufficient to prove the indictments' allegations, we overrule Pierson's second issue.

## Conclusion

Having overruled Pierson's two issues, we affirm the trial court's judgments.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 27, 2024